UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:

TAMPA BAY MARINE TOWING           CASE NO: 8:20-bk-01418-CED
 & SERVICE, INC.                          CHAPTER 11

      Debtor.
_____/

## CASE STATUS REPORT

COMES NOW, the Debtor, TAMPA BAY MARINE TOWING & SERVICE, INC. (the "**Debtor**" or "**TBMT**"), by and through undersigned counsel, and pursuant to Administrative Order TPA-2005-2 hereby files this Case Status Report as follows:

## BACKGROUND

1. This instant Chapter 11 Case was filed on February 19, 2020 (the "**Petition Date**") under Chapter 11 of the Code, Case No. 8:20-bk-01418-CED, and remains pending in the United States Bankruptcy Court, Middle District of Florida, Tampa Division (this "**Case**").

2. The Debtor is a "small business debtor" pursuant to 11 U.S.C. §101(51D) of United States Bankruptcy Code (the "**Code**").

3. The Debtor operates as a Debtor-In-Possession pursuant to § 1107(a) of the Code.

4. On the Petition Date, Debtor elected to operate under Chapter 11, Subchapter V of the Code ("**Sub. V**").

5. Dr. Ruediger Mueller is the appointed Chapter 11 Trustee ("**Chapter 11 Trustee**") pursuant to Sub. V.

6. The Debtor is a Florida corporation registered under the state of Florida, Division of Corporations by filing its Articles of Incorporation on July 25, 2000.

7.      The Debtor's principal place of business and assets are located at 3300 39th Ave., St. Petersburg, FL 33712.

## Debtor Purchase and Franchise Background

8.      Kathleen Moreno ("**K. Moreno**") and her husband, Raul Moreno ("**R. Moreno**") (K. Moreno and R. Moreno collectively the "**Morenos**") purchased the Debtor from Eugene N. Shute, IV ("**Shute**") for $857,500.00 pursuant to that certain Sea Tow Tampa Bay Sales & Assignment January 29, 2015 (the "**Purchase Agreement**").

9.      The Debtor has always operated as a franchisee of Sea Tow Services International, Inc. ("**STSI**" or the "**Franchisor**"). Part of the Purchase Agreement involved assignment of the franchise and the Debtor entered into that certain Franchise Agreement dated April 23, 2020 with STSI (the "**Franchise Agreement**").

10.     STSI is known as "your road service at sea" and has over 100 franchises throughout the United States and Europe. STSI through its franchisees, like the Debtor, offers paying recreational and small commercial boaters ("**Sea Tow Members**") certain services through a membership business model, similar to what AAA does with vehicle owners.

11.     Most Sea Tow Members pay about $179.00 per year and join at various times of the year ("**Member Funds**"). However, most Sea Tow Members join during the "boating season", which begins in March, along-side major regional boat shows throughout the country and ends in August. The Franchisor collects Member Funds generated by franchisees through sales and annual renewals. The Franchisor then distributes a portion of the Member Funds to franchisees after taking out their cut for franchise fees, reciprocal tow fund fees, credit card processing fees, donations, trailer care fees etc. In addition to the fees, STSI has the ability to penalize franchisees under the

Franchise Agreement. The Franchisor keeps approximately thirty percent (30%) of the Member Funds for one reason or another.

12. The description and calculation of the fees under the Franchise Agreement seems duplicitous and the Chapter 11 Trustee and undersigned counsel for the Debtor are working with the K. Moreno towards gaining a fuller understanding of how the fees are calculated and remitted to franchisees.

13. The Morenos financed the purchase of the Debtor by entering into two (2) separate promissory notes with Synovus Bank ("**Synovus**") for a total amount of $825,000.00. (the "**Promissory Notes**"). The Debtor is also a borrower on the Promissory Notes. The Promissory Notes were secured by two (2) security agreements (the "**Security Agreements**"). The Security Agreements encumbered all assets of the Debtor. Additionally, the Morenos mortgaged their homestead and personally guaranteed the Promissory Notes (the "**Synovus Lien**"). The Debtor's largest creditor is Synovus who is owed approximately $588,000 as of the Petition Date. The Promissory Notes are backed by the Small Business Administration.

14. K. Moreno operated the Debtor until about November 2019, R. Moreno never had any real involvement with the Debtor but signed as a personal guarantor on the Promissory Notes along with K. Moreno.

## The Shute Dispute

15. On August 21, 2017, Shute filed suit against the Debtor and the Morenos alleging breach of contract and unjust enrichment in the Sixth Judicial Circuit, Pinellas County, Florida, Case No. 17-005174-CI (the "**Shute Lawsuit**"). Attorney Mitchell Stein ("**Stein**") represented the Debtor and the Morenos against Shute. Stein is lead corporate counsel for STSI as well and later represented STSI against the Morenos and the Debtor.

16. The Shute Lawsuit was precipitated by a disagreement between the Morenos and Shute. The Morenos alleged, among other things, that certain assets were not titled as represented and that sales tax was not paid on those assets leaving the Debtor with the burden of paying. Additionally, the Debtor and the Morenos alleged that the former owner, Shute, failed to meet his obligations for, among other things, hands on training and failing to pay federal employment taxes that Shute was allegedly responsible for. Debtor alleges that Shute's failure to pay employment taxes due under his tenure lead to a levy against the Debtor and the Morenos.

17. With Stein as counsel, and after a default was entered against the Debtor and the Morenos, the Debtor and the Morenos entered into a settlement agreement with Shute (the "**Shute Settlement Agreement**") in order to end the Shute Lawsuit. The Shute Lawsuit was dismissed after execution of the Shute Settlement Agreement and pursuant to a stipulation signed by Stein as counsel for the Debtor and Morenos, which was filed in the Shute Lawsuit.

18. The Shute Settlement Agreement that Stein negotiated resulted in that certain promissory note wherein the Debtor is the maker and Shute is the lender in the principal amount of $138,625.00 plus $10,000 in accumulated interest, with a 7.5% interest rate along with interest of $22,261.41 being deemed earned at time of execution (the "**Shute Promissory Note**"). The Shute Promissory Note is paid through STSI from Debtor's Member Funds. Additionally, STSI guaranteed payment to Shute. The Shute Promissory Note costs the Debtor $3,351.80 monthly from its Member Funds.

19. Stein charged the Debtor $17,000 in attorney's fees plus additional interest and fees for his representation during the Shute Lawsuit.

**The Synovus Foreclosure Case**

20.     In April 2019, Synovus filed an action for foreclosure on Debtor's personal property for past due payments relating to three separate notes secured with UCC-1 blanket liens. The lawsuit was brought in Pinellas County, Florida and was designated case number 19-002490-CI (the "**Synovus Foreclosure Case**").

21.     Synovus has a blanket lien via UCC-1 filing(s) and a pending judgement for foreclosure on the Debtor's assets. The value of the Debtor's assets encumbered by the Synovus lien is approximately $156,000.

22.     The emergency nature of Debtor's filing of this Reorganization arises from the filing of a motion for summary judgment by Synovus and the resulting hearing that occurred on February 18, 2020, the day before the filing of this case.

**STSI Revokes the Franchise Agreement due to the Synovus Foreclosure**

23.     STSI alleges that it had a right under the Franchise Agreement to announce a breach as a result of the Synovus Foreclosure Lawsuit. Consequently, in September 2019, STSI announced a breach of the Franchise Agreement through its attorney, Stein, and began withholding all Membership Funds from the Debtor.

24.     Withholding the Membership Funds crippled the Debtor and is the proximate cause of this Case. Additionally, Debtor-in-possession alleges the ownership of the Memberships and the Membership Funds, are property of the estate pursuant to § 541 of the Code.

25.     Approximately, late October to early November 2019, STSI formally revoked and terminated the Franchise Agreement.

26. The formal date of revocation of the Franchise Agreement according to STSI is backdated to May 11, 2019, which is thirty (30) days after the Synovus Foreclosure Lawsuit was filed.

27. STSI alleges that it had the right to terminate the Franchise Agreement 30 days after the Synovus Foreclosure Lawsuit was filed pursuant to Article 16 § 16.1 of the Franchise Agreement. However, the document formally revoking the Franchise Agreement, that certain Termination and Relinquishment Agreement between STSI and the Debtor (the "**TARA**") is signed by Mitch Stein on behalf of STSI on October 28, 2019.

### The TARA

28. The TARA is an eight-page document, including boiler plate and signature pages, that Stein drafted and signed on behalf of STSI. Stein then charged the Debtor $25,000, payable to Stein's firm, Stein Law, P.C., for drafting the TARA. The fees charged by Stein were paid by K. Moreno using personal funds and cash advances from personal credit cards.

29. The terms of the TARA and the fee to Stein were non-negotiable.

30. According to the TARA, STSI alleges that the Debtor received certain money in the form of a percentage of Membership Fees and that the money is not owned by the Debtor but that it was received by the Debtor expressly as trust money to be held in trust and earned only upon expiration of the membership term(s) the fees related to. Further, STSI alleges that upon termination of the Franchise Agreement the Debtor must return the pro rata portion thereof comprising the unexpired period of said memberships as of May 11, 2019, in the amount of $567,637.87. Obviously, the legality, mechanics and calculations of that number is suspect. Additionally, the whereabouts of the funds are unknown and according to the Debtor, they have never actually been received.

31. STSI then entered into a management agreement (the "**Management Agreement**") with Tampa Bay Marine Recovery, Inc ("**TBMR**") to run the business of the Debtor. TBMR is owned by Erich Jaeger ("**Mr. Jaeger**") and his wife Abby Jaeger ("**Mrs. Jaeger**"). Mr. Jaeger is the son of Kathleen Moreno. Mr. Jaeger worked as a manger for the Debtor until TBMR took over the business operations.

32. Stein then charged TBMR $25,000, payable to Stein's firm, Stein Law, P.C., for drafting the Management Agreement, which is being paid by the Debtor's Member Funds.

33. The Debtor then entered into an equipment leasing agreement with TBMR (the "**Equipment Lease Agreement**"). At this time, all the Debtor's equipment is leased by TBMR. TBMR pays $3508 per month pursuant to the Equipment Lease Agreement.

34. The Debtor then uses the lease funds to make regular monthly payments to secured creditors Ford Motor Credit and System Service Technology. The Debtor anticipates that it will reject the current lease agreement with TBMR and enter into a new agreement that increases the amount of the lease payments so that the Debtor can service its debt and reorganize. The lease payments from TBMR is the only revenue the Debtor has been receiving since September 2019 when STSI began holding member funds from the Debtor. Prior to the revocation of the franchise the Debtor's revenue consisted of income from memberships, marine towing for those that do not have memberships, marine salvage, and marine recovery of boats.

35. The Debtor has not received member funds from STSI since September 2019 when STSI began holding the funds as a result of the Synovus lawsuit. The Debtor ran on the personal savings of the Morenos, salvages and non-member jobs until November 11, 2019 when STSI officially revoked the franchise under the TARA and put TBMR in place as the management

company to the run the business operations of the Debtor. However, the Debtor continued to service members during that time with no compensation or way of recovering funds.

36. STSI releases member funds to TBMR twice a month and TBMR operates as the de facto franchisee. STSI maintains that TBMR must pay another franchise fee of $725,000 in order to remain as the de facto franchisee.

37. Prior to the withholding of Member Funds by STSI in September 2019, the Debtor had approximately $795,000 in gross revenues and total expenses of $808,593.68. In 2018 The Debtor had $1,137,169 in gross revenues and a cost of goods sold of $1,136,669. In 2017 the Debtor had $1,061,576 in gross revenues and a cost of goods sold of $1,058,986.

38. As of the petition date the Debtor does not owe employee funds and does not have any employees of its own. The management company, TBMR has approximately 8 employees and is current on all wages and taxes associated therewith.

39. Debtor indicated in its case management summary that it appeared the management company, TBMR, was doing well and generating revenue and that Debtor was considering leaving the management company in place and reorganizing by restructuring its agreement with the management company so Debtor can service debt through a Chapter 11 plan of reorganization.

## CREDITORS AND CLAIMS

40. Ford Motor Credit Company, LLC ("**FMCC**") is fully secured by its purchase money security interest in Debtor's 2016 Ford F-350 truck, last six of VIN B2037 (the "**2016 F350**"). FMCC timely filed its Claim No. 1 in the amount of 18,022.25, which Debtor does not dispute at this time. Debtor was current on payments to FMCC pre-petition and remains current post petition.

41. Boat Finance, LLC ("**Boat Finance**") is fully secured by its first position purchase money security interest in six (6) Tohatsu Boat Motors (the "**Tohatsus**") as more particularly described in its timely filed Claim No. 2 in the amount of $63,249.13, which Debtor does not dispute at this time. Debtor was current on payments to Boat Finance pre-petition and intends to stay current post-petition.

42. The Internal Revenue Service filed its bifurcated Claim No. 3 with a general unsecured amount of $5,311.80 and a priority amount of $2,142.15. Claim No. 3 is timely, but Debtor reserves its rights to dispute.

43. American Express National Bank filed Claim No. 4 for $403.18 and Claim No. 5 for $13, 196.67. Both claims are unsecured and timely. Debtor reserves its right to dispute.

44. The last date to file claims is April 29, 2020 (the "**Claims Bar Date**").

## DEBTOR POST POSITION

45. The Debtor made its appearance at its initial debtor interview (the "IDI") on February 26, 2020 with the United States Trustee and eventually satisfied all requirements regarding proof of insurance and other requisite documentation. Also, on February 26, 2020, Counsel for the Debtor, Chapter 11 Trustee, K. Moreno and Mr. Jaeger conducted a site visit of the primary business place of the Debtor. Counsel for the Debtor and Chapter 11 Trustee visually inspected most of the Debtor's equipment, which consisted entirely of the collateral of Boat Finance, FMCC, and Synovus. Three boats were not visually inspected but are known to be in frequent use assisting Sea Tow Members and conducting regular recovery/salvage operations.

46. The Boat Finance collateral consisting of the Tohatsus appeared intact and operable. The FMCC collateral consisting of the 2016 Ford F150 appeared intact and operable. Most Synovus collateral appeared intact and operable except as indicated on the appraisals

attached to Debtor's Schedule B found at Doc. No. 31. The value of the Synovus collateral is approximately $156,000. However, as indicated above Synovus, has a pending judgment in the amount of $588,000. The Estate is considering valuation pursuant to section 506.

47. The Debtor has no actual employees and leases its equipment to TBMR as indicated above. Mr. Jaeger and his wife, Abby Jaeger, own and operate TBMR and have been acting as de facto franchisees pre-petition and post-petition pursuant to the TARA and the Management Agreement.

Mr. Jaeger is an avid mariner and a licensed boat captain with considerable experience and skill in his profession. Mrs. Jaeger has been managing the finances for TBMR. Mrs. Jaeger sent various helpful reports and financial information to Counsel for the Debtor and the Chapter 11 Trustee that has been essential to understanding the parameters within which a potential reorganized debtor most conform.

According to the financial information received, funds flowing through TBMR show a five (5) month historical performance, spanning pre and post-petition, that indicates an ability to service the Debtor's secured debt under reasonably commercial terms, and pay all other fixed expenses along with reasonable salaries for the owners/operators.

48. As indicated above, the Debtor's sole income, at this time, is the revenue from the Equipment Lease it has with the management company, TBMR. The lease payments of $3508 per month barely covers the payments to Boat Finance and FMCC.

49. On or about March 6, 2020, after conferring with counsel for Synovus, Debtor filed its Emergency Motion to Use Cash Collateral (Doc. No 25). Synovus and the Debtor agreed to interim cash collateral usage in exchange for adequate protection payments in the amount of $3500 payable on March 15, 2020 and April 15, 2020. Debtor is current on its adequate protection

payments to Synovus only because K. Moreno has personally made both payments without expectation of return in order to provide the Estate time to adequately evaluate the situation and provide a course of action. A hearing regarding the continued use of cash collateral is set for April 30, 2020.

## KEYS TO REORGANIZATION

50. Fortunately, the management and cash flow for a reorganized debtor seem to be in place. The Jaegers have the management under control and the Franchise Agreement is producing significant cash flow for its de facto franchisees and STSI. Unfortunately, neither are generating funds for the Debtor to pay its creditors. Fundamentally, that must change. The current management has shown the ability to produce the same result for the Debtor, or a potential successor, if it retains the Franchise Agreement.

51. The Franchise Agreement, along with the Sea Tow Members and Member Funds are property of the Estate pursuant to section 541. To the extent such property may no longer be in possession of the Debtor, it and its subsequent transferee are subject to the claw back provisions provided for in section 544 pursuant to sections 547 and 548. In addition, the Estate has identified several other statutory and common law causes of action against STSI and its counsel of record, Mitchell Stein. The Debtor-in-possession is interviewing candidates for special counsel in order to facilitate the return of any stray property of the estate and to recover any preferential or fraudulent transfers. The Estate sent insurance demand and litigation hold letters to STSI and Stein on or about March 17, 2020 via email, regular mail and certified mail. No response yet.

52. Retention of the Franchise Agreement is key, however, STSI seeks to charge another $750,000. Debtor maintains the Franchise Agreement is property of the estate and is not subject to another $750,000 fee in order to retain.

53. A final key to reorganization is the restructuring of general unsecured debt resulting from section 506 valuations, lines of credit, and credit cards. The Estate will endeavor to work with creditors to seek a mutually agreed resolution but reserves all rights under the Bankruptcy Code that may impose a plan of reorganization over the objection of creditors, equity holders and other parties-in-interest.

Dated: April 15, 2020.

                                                                                                 */s/ Jake C. Blanchard*
                                                                                                  BLANCHARD LAW, P.A.
Jake C. Blanchard, Esquire
Attorney for Debtor
1501 S. Belcher Rd. Unit 6B
Largo, FL  33771
Telephone:  (727) 531-7068
Facsimile:  (727) 535-2086

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via the Court's CM/ECF Service, and/or U.S. Mail, to the United States Trustee, Timberlake Annex, Suite 1200, 501 E Polk Street, Tampa, FL 33602, Sea Tow Services International, Inc. c/o Mitchell Stein, Stein Law, P.C. 24 Woodbine Avenue Suite 4, Northport, New York 11768 and to and to those parties who receive electronic notices via CM/ECF in the ordinary course of business, on this 15th day of April, 2020.

                                                                              */s/ Jake C. Blanchard*
                                                                               BLANCHARD LAW, P.A.
Jake C. Blanchard, Esquire